# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| MARGARET A. LOEB, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 14-1120-SLR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| | ) |
| Defendant. | ) |

---

Sommer L. Ross, Esquire of Duane Morris LLP, Wilmington, Delaware. Of Counsel: Eddie Pierre Pierre, Esquire of Law Offices of Harry J. Binder and Charles E. Binder, P.C. Counsel for Plaintiff.

Charles M. Oberly III, Esquire, United States Attorney, District of Delaware, and Heather Benderson, Esquire, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia Pennsylvania. Of Counsel: Nora Koch, Esquire, Acting Regional Chief Counsel, Region III and Erica Perkins, Assistant Regional Counsel, Office of General Counsel, Social Security Administration, Philadelphia, Pennsylvania. Counsel for Defendant.

---

# MEMORANDUM OPINION

Dated: September 16, 2015
Wilmington, Delaware

ROBINSON, DISTRICT JUDGE

## I. INTRODUCTION

Margaret A. Loeb ("plaintiff") appeals from a decision of Carolyn W. Colvin, the Commissioner of Social Security ("defendant"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. (D.I. 1) Plaintiff has filed a motion for summary judgment asking the court to remand for further proceedings. (D.I. 11,12) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm her decision and enter judgment in her favor. (D.I. 13, 14) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[1]

## II. BACKGROUND

### A. Procedural History

Plaintiff filed a protective claim for DIB on March 5, 2010, asserting disability as of October 1, 2009, because of bipolar disorder. (D.I. 9-2 at 23) Her claim was denied initially and after reconsideration. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on October 25, 2012. (D.I. 9-2 at 37) Plaintiff,

---

[1]Under § 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

represented by counsel, appeared and testified. (*Id.* at 37-69) Vocational expert Tony Melanson ("VE") also testified. (D.I. 9-2 at 23 )

In a decision dated November 15, 2012, the ALJ found that plaintiff had severe impairments of depression, obesity and degenerative disc disease. (*Id.* at 9-2 at 25) The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[2] to perform medium work and was not disabled. The Appeals Council considered plaintiff's objections to the ALJ's decision and denied her request for review on July 8, 2014. (D.I. 9-2 at 2) Having exhausted her administrative remedies, plaintiff filed a civil action on September 3, 2014, seeking review of the final decision. (D.I. 1)

## B. Factual Background

The record medical evidence reflects that on November 8, 2009, plaintiff was transported to the Christiana Emergency Room ("Christiana ER") after physically assaulting her daughter. (D.I. 9-13 at 15) She was later involuntarily committed to Meadow Wood Behavioral Health System ("Meadow Wood"), with a diagnosis of

---

[2]RFC is the ability to work despite physical and/or mental limitations. 20 C.F.R. § 404.1545(c).

2

bipolar disorder and depression. Plaintiff was assessed a GAF[3] of 20. (D.I. 9-13 at 14-17)

Plaintiff admitted being very sad, noncompliant with her medications, arguing with adults in the household and drinking alcohol in excess. (*Id.* at 15) Plaintiff displayed a depressed mood with flat affect, avoided eye contact, impaired judgment and lacked energy. Prior to being discharged from Meadow Wood, plaintiff was detoxed from alcohol and prescribed medications.

On November 16, 2009, plaintiff returned to Christiana ER, complaining of suicidal ideation and mood swings. (D.I. 9-12 at 22) She was transferred to Meadow Wood for involuntary commitment and treatment. Dr. Ranga Ram, a psychiatrist, observed that plaintiff has a long history of bipolar disorder and, when in manic relapses, consumes alcohol in excess. (*Id.*) A mental status examination revealed racing thoughts, impulsivity, irritability, angry interactions, an anxious mood, grandiose thought content, impaired judgment and poor insight. (*Id.* at 23)

On November 23, 2009, plaintiff was discharged from Meadow Wood with instructions to follow up with out patient care and with her primary care physician. (*Id.*

---

[3]The Global Assessment of Function ("GAF") scale "is a metric used by the American Psychiatric Association to assess an individual's psychological, social and occupational functioning." *Saucedo v. Astrue*, 2011 WL 3651790, at *4 (D. Del. 2011). A "GAF score of 21-30 suggests a serious impairment in communication and judgment, or a severe inability to function." *McNatt v. Barnhart*, 464 F. Supp.2d 358, 361 fn. 3 (D. Del. 2006). "A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning." *Lee v. Colvin*, 2014 WL 2586935, at *2 fn. 1 (E.D. Pa. 2014). A rating between 51 and 60 on the GAF scale indicates either "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Text Revision*, 34 (4th ed. 2000).

3

at 24) Her discharge medications were Geodon,[4] Trazodone,[5] Lithium,[6] Propranolol,[7] and Synthroid.[8]

Subsequently, plaintiff commenced regular psychiatric treatment with Dr. Pratful C. Desai.[9] In December 2009, Dr. Desai added Klonopin[10] to plaintiff's medication regimen. (D.I. 9-7 at 10)

A report dated February 19, 2010 reflects that an ultrasound of plaintiff's thyroid was conducted after abnormal blood test results. (D.I. 9-7 at 66) No masses were detected.

In April 2010, Dr. Desai observed that plaintiff experienced anxiety due to every day stressors. (*Id.* at 215) In May 2010, plaintiff reported continued mood swings which were manageable as long as she was not under stress.

---

[4]Geodon is an antipsychotic medication. *See* http://www.drugs.com/geodon.html (last visited August 31, 2015).

[5]Trazodone is an antidepressant medicine. *See* http://www.drugs.com/trazodone.html (last visited August 31, 2015).

[6]Lithium is used to treat the manic episodes of manic depression. *See* http://www.drugs.com/lithium.html (last visited August 31, 2015).

[7]Propranolol is used to treat tremors, angina, hypertension, heart rhythm disorders, and other heart or circulatory conditions. *See* http://www.drugs.com/propranolol.html (last visited August 31, 2015).

[8]Synthroid is a replacement for a hormone normally produced by your thyroid gland to regulate the body's energy and metabolism. *See* http://www.drugs.com/synthroid.html (last visited August 31, 2015).

[9]As acknowledged by plaintiff's counsel, Dr. Desai's handwritten treatment notes are "largely illegible," yielding little decipherable information. (D.I. 12 at 7)

[10]Klonopin is used to treat seizure disorders or panic disorder. *See* http://www.drugs.com/klonopin.html (Last visited September 14, 2015).

On August 4, 2010, Wayne Tucker, D.O., family physician, completed a

Multiple Impairment Questionnaire. (D.I. 9-7 at 15) Dr. Tucker has treated plaintiff

twice a year since 2001, with the most recent examination occurring on February 9,

2010. Dr. Tucker diagnosed bipolar disorder with essential tremors, hyperactive

thyroid, and high cholesterol. (Id. at 15) He assessed plaintiff's prognosis as poor,

concluding that she was unable to function or work.

With respect to the clinical findings supporting his diagnosis, Dr. Tucker wrote:

> [Plaintiff is o]n a regime of psychiatric medications with need for
> frequent changes. [She d]emonstrates essential tremors and poor
> judgment. Should be seen more frequently in doctor's office.
> Unable to work due to above.

(D.I. 9-7 at 15)

Dr. Tucker opined that plaintiff was able to sit up to one hour total and stand/walk

up to one hour total in a "normal competitive five day a week work environment on a

sustained basis." (Id. at 17) Dr. Tucker also indicated that plaintiff could: (1) never lift

or carry any amount of weight; and (2) not use her upper extremities to reach. She

experienced good and bad days and was incapable of tolerating even "low stress." (Id.

at 20-21) Dr. Tucker concluded that emotional factors contributed to the severity of

plaintiff's symptoms and limitations. (Id. at 20)

On August 10, 2010, plaintiff returned to Christiana ER for treatment of

decompensation in her bipolar symptoms. (D.I. 9-9 at 2-14) She had not taken her

psychotropic medications for approximately four months. (Id. at 26) Examination notes

reflect that plaintiff was hostile and considered a danger to herself and others. (Id. at

28) Plaintiff appeared disheveled, maintained poor eye contact, spoke softly, interacted

5

guardedly, had a flat affect, and was anxious and irritable. (*Id.* at 44) Somatic thought content, poor insight and impaired concentration and memory were also noted. Plaintiff was diagnosed with bipolar disorder and assessed a GAF score of 21. (*Id.* at 45) She was transferred to Meadow Wood for inpatient treatment on August 10, 2010, and remained there until discharge on August 24, 2010. (D.I. 9-11 at 30-33)

Treatment notes by Dr. Ranga Ram indicate that, upon arrival at Meadow Wood, plaintiff was sullen, and unwilling to divulge personal information. (D.I. 9-11 at 30) Dr. Ram recalled successfully treating plaintiff for bipolar illness during her previous commitment to Meadow Wood. (*Id.*) Dr. Ram's mental status evaluation revealed that plaintiff was angry, irritable, hostile and uncooperative, with poor insight and impaired judgment and reasoning. Plaintiff's GAF score was set at 20. (*Id.* at 31) Dr. Ram's treatment plan was to stabilize plaintiff's medications and introduce changes if necessary. (*Id.* at 31)

On August 24, 2010, Dr. Martin Switzky, a psychiatrist, conducted a mental status evaluation. (D.I. 9-8 at 2-4) The exam revealed: (1) a mildly elevated rate of speech; (2) slightly edgy affect that was somewhat concrete and mildly blunted; (3) internal preoccupations; and (4) fair insight and judgment. Plaintiff's GAF score was 55. She was diagnosed with "bipolar disorder, currently euthymic to mildly hypomanic without psychotic features." (*Id.* at 3)

Four days later, New Castle County police transported plaintiff to Christiana ER after she became violent toward an officer and cut herself with a razor blade. (D.I. 9-11 at 9, 11 13) Police officers reported that plaintiff displayed manic behavior, had not

6

been taking her medications and was consuming alcohol in excess. (*Id.* at 13) She

was transferred and involuntarily committed to Meadow Wood, where she remained

until discharge on September 10, 2010. (*Id.* at 3, 13)

Dr. Afolarin Banjoko, M.D., performed a psychiatric evaluation on August 29,

2010. (D.I. 9-11 at 13-15) Dr. Banjoko observed:

> Plaintiff was casually dressed, passively cooperative, anxious with
> increased eye contact. Her speech was spontaneous, distractible,
> evasive, and guarded. She was anxious in mood and affect. She
> had flights of ideas and was jumping from one to another. She
> was alert and oriented x3. Attention and concentration were
> markedly decreased. Insight and judgment were impaired.

(D.I. 9-11 at 14) Plaintiff's GAF score was 30. (*Id.* at 15)

On September 22, 2010, plaintiff initiated treatment with Horizon House

Behavioral Health Services ("Horizon"). (D.I. 9-7 at 33) Plaintiff reported feeling

anxious and feared closed-in places. (*Id.* at 39) She was alert and oriented, spoke

coherently and had normal motor activity. (*Id.* at 38) Plaintiff denied suicidal or

homicidal ideation, delusions, and hallucinations.

In November 2010, plaintiff stated her commitment to comply with the treatment

regimen outlined at Horizon. (D.I. 9-15 at 49) Treatment notes reflect that plaintiff

attended all therapy sessions every month from November 2010 to January 2012. She

was compliant with medications. In December 2010, she reported "feeling stable and

calm, experiencing only mild occasional depression and anxiety" while on prescribed

medications. (*Id.* at 48) Plaintiff was described as friendly, cooperative and cheerful.

On November 9, 2010, Dr. Desai completed a Psychiatric/Psychological

Impairment Questionnaire. (D.I. 9-7 at 55) Dr. Desai diagnosed bipolar disorder with a

7

guarded to poor prognosis even with treatment. Her GAF was assessed at 55. Dr. Desai identified the following clinical findings to support the prognosis: (1) sleep disturbance; (2) personality change; (3) mood disturbance; (4) emotional lability; (5) delusions or hallucinations; (6) psychomotor agitation or retardation, paranoia or inappropriate suspiciousness; (7) difficulty thinking or concentrating; (8) oddities of thought, perception, speech or behavior, perceptual disturbances; and (9) illogical thinking or loosening of associations, manic syndrome, hostility and irritability and mood swings. (*Id.* at 56) .

Dr. Desai indicates that as of May 25, 2010, plaintiff was taking: Lithium, Inderal,[11] Zoloft. (*Id.* at 60) He concluded that plaintiff was incapable of "even low stress." (*Id.* at 61)

In March 2011, plaintiff reported feeling mildly depressed and anxious, with occasional panic attacks occurring when home alone or in a grocery store. (D.I. 9-15 at 45) She expressed a desire to resume working, but was concerned about anxiety. Plaintiff was compliant with medication and individual therapy sessions.

On March 23, 2011, plaintiff was evaluated by Dr. Tucker for back pain. (D.I. 9-16 at 2) Plaintiff, 5 feet 7 inches tall, weighed 230 pounds at the time of examination. X-rays of plaintiff's lumbar spine showed mild lumbar spine facet arthropathy with minimal degenerate end plate spurring. (*Id.* at 13)

---

[11]Inderal is used to treat tremors, angina, hypertension, heart rhythm disorders, and other heart or circulatory conditions. *See* http://www.drugs.com/inderal.html (last visited September 14, 2015).

Progress notes from April 6, 2011, describe plaintiff as calm and stable, and getting along well with family members. (*Id.* at 64) Plaintiff acknowledged significant improvement in her mental status and discussed useful cognitive coping techniques. Although she was unable to continue with therapy sessions due to her insurance company's refusal to pay such expenses, plaintiff remained calm and friendly.

In August 2011, plaintiff reported feeling mildly depressed, with no manic episodes. (D.I. 9-15 at 27-29, 42) Progress notes reflect that her medications were adjusted. (*Id.* at 27-28)

A September 30, 2011 MRI of the lumber spine indicated a mild disc bulge at the L3-4 level, L4-5 "disc desiccation with mild circumferential bulge with ligamentum flavum hypertrophy and facet arthropathy resulting in flattening of the ventral thecal sac, central zone annular fissuring, no stenosis." (*Id.* at 24)

By October 2011, the changes in plaintiff's medications had eliminated feelings of panic symptoms and she felt calm and stable. (*Id.* at 41) Progress notes state that plaintiff was compliant with medications and had fair insight into her mental health condition.

An EMG performed on October 11, 2011 revealed some mild L5 radiculopathy in the right and lower left extremities, minimal in nature. (D.I. 9-16 at 17-18) Dr. Wai Wor Phoon found that "[c]linically, plaintiff had normal deep tendon reflexes, good strength, and normal sensations." (*Id.* at 18)

In January 2012, plaintiff underwent a comprehensive psychological re-evaluation at Horizon. (D.I. 9-15 at 17) Plaintiff reported not experiencing any major

9

bipolar episodes in over a year. (Id.) A mental status examination revealed that plaintiff: (1) appeared neat and clean; (2) was alert and oriented; (3) displayed normal motor behavior; (4) spoke normally; (5) was euthymic with congruent affect; (6) had logical and coherent thought processes; (7) denied any hallucinations, paranoia, suicidal or homicidal ideation; (8) had good insight and judgment; (9) had average knowledge; (10) had normal recent and remote memory; and (11) had intact concentration. (Id. at 18) She was compliant with maintenance medication, was symptom free and had a "normal" mental status examination. (Id. at 19) Plaintiff's GAF score was assessed at 65. (Id. at 20)

In February 2012, she reported feeling stable and calm, with reasonable insight into her condition. (D.I. 9-15 at 39) Progress notes reveal that plaintiff continued to comply with medication and therapy sessions through May 2012. Plaintiff was discharged from Horizon on May 23, 2012 because she had obtained private insurance. (Id. at 36) On February 16, 2012, x-rays of the left wrist showed mild degenerative changes involving the radial carpal bones. (D.I. 9-16 at 15)

In July 2012, plaintiff initiated mental health treatment with Patricia Lifrak, a psychiatrist. (D.I. 9-16 at 50) In August 2012, plaintiff was doing well, but needed to switch to generic medication due to cost. (Id. at 51)

On July 26, 2012, plaintiff presented to Dr. C. Obi Onyewu for lower back pain. (D.I. 9-16 at 32) Dr. Onyewu found that plaintiff was not in acute distress, had full muscle strength and walked with a normal gait. (Id. at 34) In order to treat plaintiff's intervertebral disc disorder, Dr. Onyewu suggested a lumbar discogram to evaluate

annular tear. (Id. at 34-35) He also discussed scheduling a caudal epidural steroid injection for treatment of plaintiff's lower back. Dr. Onyewu prescribed pain medication. (Id. at 34) On August 21, 2012, plaintiff underwent an epidural injection. (Id. at 38)

During a December 26, 2012 appointment, plaintiff reported feeling well, no longer depressed, and without manic symptoms. (D.I. 9-16 at 53) Dr. Lifrak diagnosed bipolar disorder and anxiety disorder. Dr. Lifrak found plaintiff "stable" and continued current treatment and medications, to wit, Vistaril,[12] Trilafon,[13] Cogentin,[14] and Zoloft.[15]

On April 8, 2013, plaintiff reported having good and bad days, "but more good than bad." (D.I. 9-16 at 54) She was stable with medication and declined medicine changes/adjustments. She denied any manic episodes, depression or hallucinations.

During a July 15, 2013 office visit with Dr. Lifrak, plaintiff reported feeling well, without depression, manic episodes or psychosis. (D.I. 9-16 at 55) Her sleep and appetite were good, but energy was slightly decreased. Dr. Lifrak continued plaintiff's medication regimen. (Id. at 55)

---

[12]Vistaril reduces activity in the central nervous system. See http://www.drugs. com/vistaril.html (last visited September 10, 2015).

[13]Trilafon is an anti-psychotic medicine used to treat psychotic disorders such as schizophrenia. See http://www.drugs.com/mtm/trilafon.html (last visited September 10, 2015).

[14]Cogentin is "an anticholinergic. It works by decreasing the effects of acetylcholine, a chemical in the brain. This results in decreased tremors or muscle stiffness." See http://www.drugs.com/cdi/cogentin.html (last visited September 10, 2015).

[15]Zoloft is an antidepressant used to "treat depression, obsessive-compulsive disorder, panic disorder, anxiety disorders, post-traumatic stress disorder, and premenstrual dysphoric disorder." See http://www.drugs.com/zoloft.html (last visited September 10, 2015).

11

On January 13, 2014, plaintiff appeared for an office visit with Dr. Lifrak. (D.I. 9-16 at 56) Plaintiff reported feeling well, although she had stopped taking Zoloft because it was no longer covered by her medical insurance. Since stopping Zoloft, plaintiff has not been depressed. She has not had any manic symptoms, depression or psychosis. Although her appetite and sleep were good, plaintiff's energy was lower. Her motivation was adequate. Dr. Lifrak observed no problems during mental status examination. A 12-week follow-up appointment was scheduled.

### C. Administrative Hearing

#### 1. Plaintiff's testimony

Plaintiff testified that she born on February 14, 1964 and was 48 years of age at the time of the hearing. (D.I. 9-2 at 42) She completed high school. (*Id.* at 43) She weighs 226 pounds. Plaintiff is married and resides with her husband, 15-year old daughter, an adult daughter and two grandchildren, ages two and three. (*Id.* at 43, 62)

Plaintiff was last employed on October 1, 2009. (*Id.* at 45) From 2007 to 2009, she worked as a cashier and stock person for a retail store. (*Id.* at 44) In 2006, plaintiff worked as a cashier for a vending services company. In 2004-2005, she was a cashier for a retail store.

Plaintiff quit her job on October 1, 2009, because she was diagnosed as bipolar and depressed, and was unable to handle the mental stress. (*Id.* at 45) Although no one recommended she stop working, plaintiff felt it would be better to be at "home with people [she knew] so [she] would not wind up back in a hospital." (*Id.*) Working with the public caused mental stress and anxiety that led to panic attacks. (*Id.* at 46) Some

12

time prior to stopping working, plaintiff experienced mood swings and one occasion had to be spoken to at work. (*Id.* at 65)

In 2007, plaintiff started treatment with Dr. Desai to help with stress and mood swings. (*Id.* at 49) Dr. Desai diagnosed bipolar disorder and prescribed medication that did not help plaintiff. (*Id.* at 49) Dr. Desai encouraged plaintiff to maintain employment. Plaintiff told Dr. Desai that she believed it was best not to work because of mood swings and depression. (*Id.* at 49-50) Plaintiff remained under Dr. Desai's care until 2010 when she was no longer able to pay for treatment. (*Id.* at 50)

In June 2012, plaintiff commenced mental health treatment with Dr. Lifrak. (*Id.* at 47) Dr. Lifrak prescribed medication that helps plaintiff with side effects, mood swings and depression. Plaintiff has not been hospitalized for mental health problems since 2010. (*Id.* at 48)

While plaintiff would rather spend time alone, she gets along well with her family. (*Id.* at 51) She does not have any friends and does not socialize. She has no hobbies and does not attend church services. Plaintiff attends school events on behalf of her daughter. (*Id.* at 51) She is able to interact normally with her physicians and to sit and wait in their offices. (*Id.* at 52) She recalls on one occasion becoming agitated while waiting and leaving the office to wait outside.

Plaintiff is able to perform all personal hygiene tasks, including, showering, brushing teeth, getting dressed and combing hair. (*Id.* at 59) Plaintiff is able to cook and prepare sandwiches, but her husband cooks most of the meals. Plaintiff is able to dust and vacuum. She does not do laundry or change bed linens due to back

13

problems. (*Id.* at 60) Plaintiff has her driver's license and drives daily, running errands, going grocery shopping or taking her grandchildren to daycare. (*Id.* at 62) Plaintiff assists with the care, babysitting and feeding of her two grandchildren. When not performing these tasks, plaintiff stays at home and talks on the telephone.

Plaintiff's husband handles the family budget and finances. (*Id.* at 60-61) She does not use a computer because she does not have "the patience." (*Id.* at 61, 63) Plaintiff is also too impatient to help her daughter with school work. (*Id.* at 61)

Plaintiff does not have any problems sleeping, averaging eight hours nightly. She has problems concentrating and with her long term memory. (*Id.* at 52-53) She handles her own medication without assistance and has not missed any doctor appointments. (*Id.* at 53) She has mood swings which are akin to an "emotional roller coaster ride," alternating between "being happy to sad, to sometimes even crying and being angry." (*Id.* at 53) Plaintiff has problems with anger and irritability. She denies having racing or paranoid thoughts and is not suicidal. (*Id.* at 53-54) Plaintiff has panic attacks daily, lasting between 20 minutes to three days. (*Id.*) During an attack, she becomes nervous, easily distracted and does not want to be bothered. Plaintiff testified to having no appetite due to persistent depression. (*Id.* at 52) She admitted to gaining a "considerable amount of weight." (*Id.*) Plaintiff admitted to drinking alcohol when depressed to deal with the problem. (*Id.* at 47)

Plaintiff testified that she feels about the same since starting treatment in 2007, but continues treatment because the medication helps. (*Id.* at 55) The medication also helps keep her stable and out of the hospital. Plaintiff does not participate in group

14

therapy. The medication causes side effects, including, drowsiness and shakiness. (Id. 57) Plaintiff can lift up to five pounds. (Id. at 58) She has no problems with her hands.

Plaintiff also has degenerative arthritis with agitated nerves in her lower back. (Id. at 56) Plaintiff started treatment with a pain management physician in 2012. Plaintiff has daily pain and reports that the treatment and medication are not helping. (Id. at 56-57)

## 2. VE's testimony

Following plaintiff's testimony, the ALJ consulted VE Tony Melanson. (D.I. 9-2 at 66) In determining whether jobs existed in significant numbers in the regional and national economies that plaintiff could perform given her RFC, the ALJ posed a hypothetical question to the VE. (Id. at 67-68) In response, the VE testified that an individual with such a restricted vocational profile could still perform a representative sample of jobs, including vehicle cleaner, warehouse worker, custodial worker, mail room clerk, addresser and sorter, inspector. (Id. at 67-69) The VE further testified that a person who was absent two days a month over a period of a year would be terminated and unable to perform any of the jobs referenced. (Id. at 70)

## D. The ALJ's Findings

The ALJ made the following findings:

> 1. [Plaintiff] meets the insured status requirements of the Social Security Act through September 30, 2014.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since October 1, 2009, the alleged onset date (20 C.F.R. 404.1571 et seq.)
>
> 3. [Plaintiff] has the following severe impairments: depression,

15

obesity and degenerative disc disease ("DDD") (20 C.F.R. 404.1520(c)).

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.152(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that [plaintiff] has the RFC to perform medium work as defined in 20 C.F.R. 404.1567(c) except; she can only perform simple unskilled work that does not involve production pace work and only occasional changes in the work-setting. [Plaintiff] must be essentially isolated with having only occasional contact with the public, co-workers and supervisors.

6. [Plaintiff] is unable to perform any past relevant work (20 C.F.R. 404.1565).

7. [Plaintiff] was born on February 14, 1964 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563).

8. [Plaintiff] has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not [plaintiff] has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering [plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform (20 C.F.R. 404.1569 and 404.1569(a)).

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from October 1, 2009, through the date of this decision (20 C.F.R. 404.1520(g)).

(D.I. 9-2 at 25-31)

## III. STANDARD OF REVIEW

16

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. Accordingly, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. See Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. See id. In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. See id. at 1190–91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict

should not be directed." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir.1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir.1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner's] decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner's] decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Regulatory Framework

18

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his or her past work. If the claimant cannot perform his or her past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel*, 228 F.3d 259, 262–63 (3d Cir.2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is

19

given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2) & 404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

## B. Arguments on Appeal

On appeal, plaintiff contends that the ALJ failed to: (1) properly weigh medical evidence of treating physicians; and (2) properly evaluate plaintiff's credibility. (D.I. 12) Defendant counters that the ALJ's RFC assessment included all of plaintiff's functional limitations that were supported by the record. (D.I. 14) Further, the ALJ reasonably concluded that plaintiff's subjective complaints of disabling mental and physical limitations were only partially credible considering plaintiff's daily activities, the medical evidence, treatment course and effectiveness.

### 1. Weight of medical evidence

Plaintiff contends the ALJ improperly disregarded the opinions of her treating psychiatrist (Dr. Desai) and physician (Dr. Tucker). Generally, the weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4). To that end, the more consistent an opinion is with the record as a whole, the more weight is given to that opinion. 20 C.F.R. § 404.1527(c)(4).

A treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and

consistent with other substantial evidence. *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); 20 C.F.R. § 404.1527(c)(2). The more a treating source presents medical signs and laboratory findings to support his/her medical opinion, the more weight it is given. *Id.* Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id.* An ALJ may only outrightly reject a treating physician's assessment based on contradictory medical evidence or a lack of clinical data supporting it, not due to his or her own credibility judgments, speculation or lay opinion. *Morales v. Apfel*, 225 F.3d at 318; Lyons–Timmons v. Barnhart, 147 F. Appx. 313, 316 (3d Cir.2005).

Even when the treating source opinion is not afforded controlling weight, it does not follow that it deserves zero weight. Instead, the ALJ must apply several factors in determining how much weight to assign it. *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 662 (D. Del. 2008). These factors include the nature and extent of the treatment relationship, the length of the treatment relationship, the frequency of examination, supportability of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* If an ALJ does not conduct this analysis, a reviewing court cannot determine whether the ALJ actually considered all the relevant evidence, and the ALJ's decision cannot stand. *Id.*

Considering this authority against the instant record, the court finds that the ALJ did not err in considering the opinions from Dr. Desai or Dr. Tucker. The record demonstrates that once plaintiff became compliant with treatment and medication, her

21

symptoms improved significantly. The ALJ correctly found that neither Dr. Desai nor Dr. Tucker's opinions were consistent with plaintiff's level of functioning after she became compliant. The ALJ reasonably afforded little weight to Dr. Desai's opinions in light of his own findings that plaintiff's mood improved once medication was adjusted. Further, the ALJ considered Dr. Desai's opinion and added within the RFC that plaintiff could only perform simple unskilled work. Similarly, the ALJ reasonably concluded that Dr. Tucker's opinion that plaintiff's bipolar disorder precluded her ability to perform any work was not supported by the record evidence.

To the extent that plaintiff asserts that the ALJ did not consider all relevant evidence, the Third Circuit has stated that there is no requirement for the ALJ to discuss or refer to every piece of evidence of the record, as long as the reviewing court can discern the basis of the decision. *Fargnoli v. Massanari*, 247 F.3d at 42. The ALJ at bar stated that she considered all the evidence of record. *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (the mere failure to cite to specific evidence does not establish that the ALJ failed to consider it); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (the ALJ need not evaluate in writing every piece of evidence submitted). Having considered the ALJ's decision, it is evident that she considered all the record evidence and provided sufficient reasons for the court to discern her decision.

## 2. Plaintiff's credibility

When making determinations as to a claimant's credibility, an ALJ must "determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d

Cir.1999). In assessing plaintiff's credibility, the ALJ found that her allegations that she is completely unable to perform any work activities is not supported by the medical evidence of record. Specifically, plaintiff decided independently to stop working after receiving a diagnosis of bipolar disorder, not because any physician told her to do so. Plaintiff's hospitalizations occurred when she was not compliant with medication and therapy. Plaintiff testified that the medications have somewhat stabilized her mood. She also acknowledged being able to get along with family members, driving, cooking and caring for her two young grandchildren. Significantly, during appointments with Horizon and Dr. Lifrak, plaintiff reported feeling well, with no manic episodes and acknowledged significant improvement in her mental health. The ALJ's reasons are supported by the record evidence and the court finds no reason to disturb the findings. *See Metz v. Federal Mine Safety and Health Review Com'n,* 532 Fed. Appx. 309, 312 (3d Cir. 2013) ("Overturning an ALJ's credibility determination is an 'extraordinary step,' as credibility determinations are entitled to a great deal of deference.").

## V. CONCLUSION

For the reasons discussed above, plaintiff's motion for summary judgment will be denied and defendant's motion for summary judgment will be granted. An appropriate order shall issue.

23